Filed 1/12/24  Marriage of Hembree CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of GWENDOLYN KIM and HUBERT MACK HEMBREE. | |
| | D081110 |
| GWENDOLYN KIM HEMBREE, | |
| Appellant, | (18FL010278N) |
| v. | |
| HUBERT MACK HEMBREE, | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Robert C. Longstreth, Judge.  Affirmed.

Law Office of Dennis Temko and Dennis Temko for Appellant.

Hubert Mack Hembree, in pro per. for Plaintiff and Respondent.

Plaintiff Gwendolyn Kim Hembree (Kim) and defendant Hubert Mack Hembree (Mack) were married for more than 34 years until their divorce in August 2019. In December 2019, the parties voluntarily attended a mediation (with their respective counsel) that led to an enforceable marital settlement agreement in which they agreed to a division of their community estate. In March 2020, that agreement was incorporated into a stipulated judgment.

In August 2020, Kim filed a request for order to set aside the judgment under Family Code[1] section 2122, or alternatively, to enforce the judgment and divide assets under section 2556. In her motion, Kim claimed community assets had been omitted from the marital settlement agreement, Mack had misrepresented the value of certain of those assets and/or had failed to disclose others, and the division of assets was one-sided in Mack's favor. About a month later, Mack filed his own request for order, claiming Kim was in breach of the marital settlement agreement. After a lengthy trial in this "highly contested" litigation,[2] the trial court issued a statement of decision and order denying Kim's motion, and denying in part and granting in part Mack's motion.[3]

---

[1]    All further undesignated statutory references are to the Family Code.

[2]    The appellant's appendix includes 86 volumes and is over 24,000 pages. The reporter's transcript is seven volumes and exceeds 1,100 pages.

[3]    Mack has not filed a cross-appeal.

On appeal, Kim contends the trial court erred when it found (1) she received the benefit of her bargain under the settlement agreement with respect to a promissory note issued by Kurmac, Inc., dba Gems N' Loans (Kurmac), an asset belonging to the parties that operated pawnshops in California, and (2) the assets she claimed were omitted were either adjudicated in the parties' marital settlement agreement, or did not belong to the community, or even if a community asset, provided no value to it.

As we explain, we conclude the trial court did not err in denying Kim's motion. We thus affirm its August 22 order.[4]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Overview*

Mack and Kim married in December 1983 and separated in March 2018. There were no children from this marriage, which terminated on August 2, 2019, upon entry of a status only dissolution judgment. Both parties have since remarried.

---

[4] Mack, appearing in propria persona, has filed a five-page respondent's brief that does not comply with various rules of appellate procedure, including that points must be supported "by argument and, if possible, by citation to authority" (Cal. Rules of Court, rule 8.204(a)(1)(B)), and that the brief must include citations to the volume and page number of the record when referencing a matter (*id*., (a)(1)(C); see *Stover v. Bruntz* (2017) 12 Cal.App.5th 19, 31 [" 'as is the case with attorneys, [self-represented] litigants must follow correct rules of procedure' "]). Because the burden to show error is on Kim, we decide this appeal on the merits based on the record. (See *Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 80, fn. 2 ["[s]ince the burden is always on the appellant to show error," "we . . . examine the record on the basis of appellant's brief and reverse only if prejudicial error is found"].)

From 2011 until separation, Kim resided primarily in Maui, Hawaii, managing a vacation rental business she and Mack owned called Hembree Vacation Rentals (HVR),[5] while Mack resided in Oceanside, California, managing Kurmac's pawnshop business. Kurmac and HVR were the parties' two main community assets. Another asset of significance in this appeal is a promissory note Kurmac issued to Mack in December 2014 in the amount of $3,220,807.77, bearing interest at six percent with the entire note due and payable in December 2026.

B. *Mediation, the Marital Settlement Agreement, and Entry of Judgment*

On December 9, 2019, the parties, their respective counsel, and Kim's retained financial expert participated in a mediation at JAMS with retired Judge Thomas R. Murphy. The all-day mediation culminated in a signed 12-page marital settlement agreement (MSA) hand-written by Judge Murphy.

1. Kim's Assets

The MSA provided Kim would receive as her sole and separate property the following assets: (1) The "sum of $250,000 which shall be paid by Mack to Kim within 14 days after the signing of this agreement." (2) "The 3,000,000 note payable to Mack and Kim and payable by Kurmac.[6] Mack and the corporation shall personally guarantee the note and shall guarantee

---

[5] Beginning in about early 2012, the Hembrees purchased three rental properties in Maui, Hawaii: the "Halama" house, a 5,000 square-foot home with a separate "granny flat," and two condominium units in a high-rise building in Wailuku.

[6] This appears to be a reference to the December 2014 Kurmac note, although that note was payable to Mack only.

4

personally that Kim shall receive the sum of $15,000 or more per month. No interest on the $3,000,000 note. Should any 2 payments be missed, the balance shall become due and payable. Should Mack's interest in Kurmac, Inc., be sold prior to the payoff of the $3,000,000 note, the balance then due on the note shall become due and payable. Mack shall further make arrangements in his Estate Planning (Will, Trust, etc.) to insure the guarantee of the above payments to Kim." (3) The "sum of $2,000,000 first upon the close of escrow of the real property located [on] . . . Halama Street in [Hawaii]." (4) The gold in her possession. (5) The parties' interest in a condominium located in Oceanside, "with the understanding that Mack shall pay $100,000 from the sale of Halama towards the outstanding mortgage . . . ." (6) The IRA in her name. (7) The parties' interest in a Carlsbad timeshare. (8) One-half of the parties' interest in a mobile home located in Mexico.

2. Mack's Assets

The MSA provided Mack would receive as his sole and separate property the following assets: (1) "Any and all stock the parties may have or interest in, in the corporation known as Kurmac, Inc. Mack shall assume and hold Kim harmless from any debt associated with Kurmac, Inc. which the parties or either one of them may be responsible for, including the existing Line of Credit which currently amounts to between $1,500,000–$2,000,000."[7] (2) The two Wailuku properties, which properties the parties also had previously agreed to sell. (3) The Halama property, with Mack retaining "any contractual rental deposits and income for the rental" until its sale, and

---

[7]     Kim, Mack, and the Hembree Family Trust each guaranteed payment of what was then Kurmac's $4 million line of credit. After 2020, Kim no longer was a guarantor of the credit line.

thereafter paying Kim's mother $195,000 from the proceeds. (4) An "ESOP note[8] payable to the parties with a current balance in the sum of $536,000 +/-." (5) Kurmac's corporate offices located in a commercial property on North Coast Highway in Oceanside. (6) An IRA in his name of about $18,000. (7) The other half of the Mexican mobile home.

In addition to the division of assets, the parties in the MSA expressly agreed to a "mediation waiver" "should a dispute arise re[garding] the interpretation or enforcement of this agreement"; and to a general waiver "full[y] resol[ving]" all "claims against the other" including those based on breach of fiduciary duty.

### 3. Stipulated Judgment

Kim in late February 2020 executed a declaration consenting to entry of judgment under the terms and conditions of the MSA. In March 2020, the trial court granted Mack's unopposed ex parte application to enter the judgment (on reserved issues) under Code of Civil Procedure section 664.6[9] (Judgment).

---

8    In December 2014 Kurmac's employee stock ownership plan agreed to pay Kim and Mack $1.5 million for 30 percent of their outstanding shares of Kurmac common stock, secured by a promissory note.

9    Code of Civil Procedure section 664.6, subdivision (a) empowers the trial court to enter judgment "pursuant to the terms" of the parties' settlement agreement.

C. *Requests for Orders*

In August 2020 Kim, through her newly retained guardian ad litem (GAL),[10] filed a request for order to set aside the Judgment under section 2122 on the grounds of fraud, duress, lack of mental capacity, mistake, and failure to comply with disclosure requirements; or alternatively, to enforce the Judgment and divide omitted assets under section 2556 (Motion). Kim (through her GAL) contended in her Motion that Mack received about $7 million in community assets compared to her receipt of about $2 million; that many of her bills were in collection; and that Mack had failed to comply with the Judgment, including, as relevant to this appeal, allegedly missing two $15,000 monthly payments, which Kim contended caused the entire $3,000,000—less payments already made—to become due and payable.[11]

---

[10]    Attorney Sharon Blanchet acted as Kim's GAL between July 2020 and October 2022.  Kim maintained a GAL was necessary because she suffered from "various mental health issues, including but not limited to Major Depressive Disorder.  These conditions compromise[d] her cognitive functioning in several domains, including but not limited to memory, attention, concentration, organization, planning, and mental processing."  In denying Kim's motion to set aside the Judgment, the trial court found it "telling" that, although the GAL "stood in Kim's shoes as the client directing the litigation and as the client for whose benefit the litigation was brought, [the GAL] did not testify, or otherwise provide any information suggesting that the settlement was unfair, or, except through arguments of counsel, provide any other information to the Court on the issues presented in this matter.  Kim, by contrast, testified at length, despite her contention, and the Court's necessary finding in making the [GAL] appointment, that her lack of competence has been such that she need[ed] a [GAL] in this matter."

[11]    Mack's first "missed" payment was in May 2020, when he inadvertently deposited $15,000 into Kim's attorneys' client trust account.  The second "missed" payment was in July 2020 (based on the GAL's August 7, 2020 declaration).  Kim on appeal no longer contends Mack missed any of the $15,000 monthly payments.

7

Kim contended the Judgement should be set aside under section 2122 because Mack committed fraud based on his alleged intentional underreporting of the value of certain assets including Kurmac; perjury, based on his alleged "untruthful statements" including the amount of his monthly income; duress, based on Mack's new wife's alleged "public bullying" of Kim shortly before the mediation; mental incapacity, based on medical records showing Kim had been "institutionalized" and thus lacked the requisite capacity to enter into the MSA; mistake of fact/law, based on her inability to "support herself" at the "marital standard of living" and her lack of understanding of the "mediation process"; and failure to disclose, based on the alleged "substantive deficiencies" in Mack's disclosure declarations.

Alternatively, Kim argued the Judgment should be enforced and a "number" of allegedly omitted assets divided. In addition, she sought spousal support in a reasonable amount up to the date she remarried (May 5, 2022), an "interim" award of attorney fees of $100,000, and sanctions against Mack.

Mack in response filed his own request for order. He claimed Kim breached the MSA including by failing to pay the mortgages, HOA dues, and expenses on the Hawaiian properties through March 15, 2020; and the mortgage, property tax, HOA dues, and ongoing expenses on the Oceanside condominium, causing that property to go into foreclosure, and negatively impacting his credit and Kurmac's credit line. Mack further requested the trial court stay, pending his motion to quash, the voluminous discovery propounded by Kim in connection with her Motion, and impose sanctions against Kim for her alleged bad-faith conduct.

D. *May 2022 Trial*

During opening argument, Kim's counsel explained the legal effect of her Motion, stating if the court set aside the Judgment, the parties would

8

"start over"; and if the Judgment was not set aside, the court then would "need[] to determine what's not contained within the Judgment, because there's an allegation of omitted assets and debts."

Mack's counsel described the long history of litigation after the parties' separation. This history included the parties' competing unsuccessful motions to take over each other's business operations in Kurmac and HVR, which led to the trial court's February 2019 appointment of Brian Brinig as its Evidence Code section 730[12] valuation expert.

1. Brinig's Business Valuation

Brinig testified his appointment included valuing Kurmac, HVR, a company called Riverock, Inc. (Riverock),[13] and any other business in which the parties had an interest. After his appointment, Brinig requested a series of documents from the parties to conduct his valuation analysis, which request was followed-up by an August 2019 court order. The order required Mack to submit Kurmac's audited financial statements for the year ending in 2018 and, if unavailable, the company's "internal financial statements (balance sheet and income statement)" for the same year; and to describe the business of Riverock, submit financial statements for this business "from its

---

[12]     Evidence Code section 730 provides in part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required." (Evid. Code, § 730.)

[13]     The record shows "Riverock" was also sometimes referred to as "Riverrock" and "River Rock."

inception to the present time" (including any interim financial statements), and summarize his "financial investment(s)" in Riverock.

As to the former, Brinig testified there were no audited financial statements for Kurmac. Mack, however, provided reviewed financial statements for the company for the years 2014 through 2017, and internal financial statements for 2018. As to the latter, Brinig relied on Mack's representation that he had no interest in Riverock, as Mack claimed the company belonged to his daughter and he had no access to the company's financial records. Brinig therefore did no investigation or valuation of Riverock before the mediation, including the source of funds for the business, as he considered Riverock "[o]ff the table."

In late October 2019, Kim's counsel emailed Brinig asking whether he had any information about two other companies Mack had listed on his declarations of disclosure, Laurel, Inc. (Laurel) and "Laurel One."[14] Brinig responded he had no information regarding either company.

Despite not having all the requested information, Brinig completed his first business valuation about a week before the parties' December 2019 mediation. Brinig added he prepared this valuation "very quickly" while "under the gun," and he included neither Riverock nor Laurel in his report.

The trial court in late 2020 reappointed Brinig as its expert to make additional recommendations, after the parties had filed their competing motions. Brinig's initial tasks included determining what the parties "knew at the time they entered into the [MSA] about each party's income"; "[a]ccounting, economic and discovery issues related to finances, includ[ing]

---

[14] The parties agreed and the trial court found that Laurel One and Laurel were the same entity, as Mack's inclusion of Laurel One in his preliminary disclosure was a "typo."

but not limited to Laurel"; and any change in circumstances as to their financials. In March 2021, Brinig notified the parties he was still waiting to receive supplemental documents from them to complete these tasks.

Brinig's assignment changed in May 2021, when the trial court instead requested he value each of the assets in the MSA. Brinig in late May 2021 sent the parties his preliminary valuation analysis. He "left blank spaces for the majority of the assets" because he "never had information on the values of those assets and no values are set forth in the [MSA]"; and because his pre-mediation services had been limited to a business valuation of Kurmac as of December 2019, and an income for support analysis for Kim and Mack. Based on the court's May 2021 order, Brinig asked the parties to provide "evidence of value" for each of the assets in the MSA.

In June 2021, Brinig notified the parties, the trial court, and the parties' discovery referee that he was limiting his valuation of the MSA assets to Kurmac. His decision resulted from the parties' ongoing "significant disputes" regarding the division of their estate; the lack of evidence of values for certain assets and the conflicting evidence for others; and the parties' suggestion that the scope of his new assignment included valuing "all assets" in existence on the date of mediation, " 'whether or not they were previously disclosed,' " in order to obtain a "true value" of their estate. Brinig also listed 11 assets identified by the parties that allegedly had not been divided under the MSA, including Riverock and Laurel. Brinig noted he also could not value these 11 assets due to a lack of evidence regarding their "existence" or "financial status." Brinig testified this letter was necessary because the parties were "arguing about all kinds of stuff that [he could not] solve." Brinig therefore never completed an evaluation of Riverock or Laurel.

11

2.  Kim's Testimony

In mid-April 2019, after the parties had separated, they agreed to sell the Hawaiian properties including the Halama house, which Kim considered to be her primary residence.

Kim testified that before the mediation, she never saw Brinig's preliminary business valuation report.  Kim at the time felt very intimidated by Mack, and was experiencing significant mental health challenges.

Kim recalled that before mediation, Riverock was "brought up as an issue" for Brinig to "investigate," after she found the company's "books" in Mack's "private safe."  She acknowledged that Riverock's bank statements were listed in the index of proposed exhibits attached to her mediation brief;[15] and that during a November 13, 2019 hearing, she inquired about Riverock, explaining she understood that Mack claimed he had no interest in the company.

Kim also was aware of Laurel, testifying she and Mack had "personally" "loaned Kurmac money through" this company. Kim added, "The way Mack explained it to me was that it was better for us to loan the money and then get repaid by Kurmac and we wouldn't have a tax consequence"; that Mack "was all into the LLCs and getting the best tax advantages," and she was "not really aware of all that, except for that the corporation did exist"; and that Mack wanted to pay his disabled sister a small salary through this company.  Kim testified neither Riverock nor Laurel was included in the MSA.

---

15    We note Kim's mediation brief also included as an attachment a chart of assets and debts identifying Riverock as Mack's asset with a value of $102,561.

12

Kim recalled she and Mack put $3 million into Kurmac in about 2014 and Kurmac in return issued a promissory note at six percent interest (i.e., the Kurmac note). Kim testified she believed the $15,000 she received monthly under the MSA was the "interest" on that note. When asked to explain why the MSA provided there was "no interest" with respect to this asset, Kim testified, "I believe that the agreement said that Mack was to pay no interest, but that didn't let Kurmac off the hook. It was a Kurmac note."

Regarding the December 9, 2019 mediation, Kim was accompanied by counsel,[16] a close friend, and retained financial expert Jerry Whitehead, who owned a pawnshop consulting company. Kim testified she retained Whitehead because she had not been given a value of Kurmac's pawnshops, and "he was there to help [her] look at the evaluation if it ever came up and give [her] input as to if it was a correct value or if they used the right methods or whatever." The parties initially were seated together and the mediator used a whiteboard to list their assets. Once separated, Kim recalled the mediator went back and forth between rooms "trying to put some type of deal together."

Kim's intention since the parties' separation was to split up the five pawnshops owned by Kurmac, with Mack and her each taking two and the remaining shop being sold and the proceeds divided, thus allowing for an even division of the asset. Mack, however, had rejected that idea all along, and Kim therefore was not surprised when Mack disagreed with this proposal at the mediation.

---

[16] Kim, acting alone and not through her GAL, filed a lawsuit against the attorney who had represented her at the mediation, seeking damages in excess of $7.5 million for what she alleged was the "disastrous" MSA.

As the mediation progressed, Whitehead provided input regarding Brinig's valuation of Kurmac. Kim testified Whitehead approved of Brinig's valuation, noting it "was done the way an evaluation should be done."

Kim estimated the mediation concluded at about 7:00 p.m., after her counsel encouraged her to accept the settlement. Kim testified during the mediation she was "zeroed in" on when she would have to vacate the Halama house, as Mack wanted her to move in February 2020 and, not to feel rushed, she negotiated to stay until March 15, 2020. Before signing the MSA, her counsel told her that if she subsequently disagreed with its terms the settlement could be set aside. Kim, however, then did not understand that the MSA was a "binding" agreement.

Regarding the Judgment, Kim testified on her counsel's advice she signed a declaration on February 24, 2020, allowing its entry on March 5.

At the time of the May 2022 trial, Kim had received $1.75 million[17] in cash under the MSA in addition to the monthly $15,000 payments. She admitted she had "[v]ery little" of the money left, estimating it was less than $100,000; and that, if the trial court set aside the Judgment, she had no ability to "put that money back in the pot."

3. Mack's Testimony

Mack testified that at the outset of the mediation, Judge Murphy used a whiteboard and listed the "total community assets one by one," and had the parties both agree on the value of each one of those assets, totaling about $10,640,000; and that under the MSA Kim received $5.45 million while he received $5.32 million. Mack recalled that during the mediation Kim made

_____

[17]    Out of Kim's $2 million distribution from the sale of the Halama house, the trial court in November 2020 ordered $500,000 withheld and placed in her attorney's client trust account pending resolution of Mack's reimbursement claims against her.

various settlement proposals that he did not agree to, including that she would receive an interest in Kurmac.

Regarding his $3 million payment to Kim outlined in the MSA, Mack testified it is "a note in favor of Kim Hembree to—that figure was done so that her assets would equal half of the total assets. The note was kind of an adjustment thing to make things equal," as he "didn't have the cash" to pay Kim a lump sum of $3 million. Mack added there was never a "separate note" in existence in Kim's favor.

Mack was asked about the notation on the whiteboard of "$3 million note/guarantee, [$]15,000 a month." He testified, "I understand that to mean that was an obligation payable 15,000 a month, no interest"; and that it had to be "no interest" because otherwise the payments would be "beyond what [he] could manage." Mack confirmed that $15,000 a month up to $3 million was a "principal payment"; that under the MSA he was required to personally guarantee the monthly payment even if Kurmac was sold; and that he changed his estate planning documents to guarantee the monthly payments to Kim, as required under the MSA.

Mack testified he had complied with all of the terms of the MSA, including making all the monthly payments to Kim.

Regarding the Halama property, it ended up selling for $5.8 million, considerably less than its list price of $7.2 million due to a problem with a seawall and a sinkhole Mack claimed Kim had allegedly failed to disclose. Pursuant to the MSA, Kim received $2 million from the sale and Mack a little more than $900,000. Although under the MSA Kim was responsible to make the mortgage payments on the Halama house through March 15, 2020, when Mack took over the property he discovered it in arrears.

15

Regarding Riverock, Mack acknowledged he told Brinig in September 2019 he had no interest in the company, as it belonged to his daughter Bari Hembree (Bari). Mack testified the purpose of the company was to "help" Bari. Mack put $200,000 into the company sometime in 2018, confirmed the money was a "gift," and, although he became an officer and sat on the board, he testified the company belonged to Bari and the money was hers to do what she wanted. Mack also testified he might have been a shareholder in Riverock, although he believed no shares ever issued. He confirmed Bari was listed as the sole shareholder in a March 6, 2018 document titled, "Resolutions Adopted by Sole Director and Shareholder," and listed as the "sole owner" of Riverock when she completed a business account application at a Colorado bank in August 2018.

Regarding Laurel, Mack testified he created the company about 20 years earlier in part to benefit his disabled sister, and all of the money invested in Laurel came from him. He claimed the company had "no value," as Laurel had loaned Kurmac $380,000, which Kurmac then paid back through its line of credit, which money Mack then reinvested in Kurmac. Mack added that Kim was not responsible for any of the money drawn from Kurmac's credit line.

Regarding the reason for the $380,000 note, Mack explained, "Cash flow goes back and forth[.] [M]y business has strange needs. It goes up and down all the time, depending on the public's need[] to borrow money, and so I loan money from myself, Kurmac, and just when it's convenient, wherever the money is, switch back and forth"; and that he set up Laurel after attending a seminar on "asset protection," but the company "never really did anything."

16

4. The Trial Court's Oral Ruling and Statement of Decision

a. Ruling from the Bench

On May 27, 2022, the trial court issued its tentative decision by oral statement, refusing to set aside the Judgment. The court found a failure of proof by Kim to show any purported misrepresentations by Mack were "material or would have resulted in any different outcome" in the division of assets; that, in balancing the interest of finality against the equities for reopening the case, the scale was "overwhelming" in favor of finality; that there was not a "single fact" that Kim presented during the trial that she could not have presented before the settlement; and it had "zero confidence" that, if it set aside the Judgment, Kim would achieve a "better result," as it did not believe the distribution of community assets was "unfair" or that a new allocation "wouldn't be more than a trivial difference" from the allocation in the Judgment.

As relevant to this appeal, the trial court found there was no mistake as to the Kurmac note, as Kim was receiving exactly what she bargained for under the MSA: the "*value* of that note . . . established as $3 million, paid out over 15 years[.]" (Italics added.) The court therefore refused to "rewrite" the parties' agreement regarding this asset.

Regarding Riverock, the court found this asset belonged to Bari, as Mack had given the money to her as a "gift" "to do whatever she wanted to" do with it. Finally, regarding Laurel the court found the $380,000 note was actually a debt owed by Kurmac that Mack was "transferring back" between the two companies with no "net" effect on the community.

The trial court issued its statement of decision (SOD) on August 5, 2022, after Kim filed nearly 50 objections to Mack's proposed statement of decision. The court found the parties' December mediation at JAMS resulted

17

in "an agreement settling all issues" between them; and reiterated that "Kim did not present any material facts at trial that were not known before, in large part well before, the Judgment was entered."

b. Credibility

In its SOD, the trial court found Kim's testimony not credible, noting, "If it was convenient for her to provide truthful testimony she did. If it was not, she did not. For example, she professed a good recall of details that were beneficial to her legal position, and a lack of recall of details that might contradict her legal position."

As to Mack, the court found his testimony to be credible on "material" issues; that, while Kim established certain statements by Mack "prior to the entry of the Judgment were false, and while . . . the Court finds that she knew of the falsity of these statements before the Judgment was entered, she did not establish that any material testimony given at trial under oath was false."

c. Set Aside

In denying Kim's Motion to set aside the Judgment, the trial court in its SOD balanced the interest of assuring the finality of a final judgment against the proper division of marital property. It found Kim pre-Judgment was fully aware of the issues she litigated in her Motion, including her claims that material information was not disclosed by Mack, and despite that knowledge, she "consciously and voluntarily" chose not to raise them, both "before and after she voluntarily reached an agreement at the mediation[.]" The court was unaware of any authority allowing a judgment to be set aside under these circumstances, and found Kim provided no such authority.

The trial court also found Kim failed to establish that the parties' MSA was an "unfair" division of assets or that she would have "obtain[ed] a better result in subsequent proceedings if the Judgment were set[]aside," adding, "[T]o the contrary, both parties would be worse off if the Judgment were set aside, and the parties were required to expend further resources to obtain a result that the Court believes would far more likely than not result in a division of the marital estate that would be equally or less favorable to Kim." The court also questioned whether Kim "could restore the parties to the pre-settlement state of affairs" if the Judgment was set aside, and found she had never offered to do so.

As to Mack, the trial court found he did not "omit[] material facts and information in the underlying dissolution action," and any purported failure by Mack to fulfill his disclosure requirements was "immaterial." The court made these findings as to Kurmac, Riverock, and Laurel.

As to Riverock, the trial court found it "was not a community asset at the time of the mediation or the entry of the Judgment," but instead belonged to Bari "at all relevant times"; and Kim knew about this asset before the mediation, had every opportunity to then investigate and address it, but did not do so. The court also found even after the litigation Kim was unable to establish Riverock was a community asset; and rejected what it determined was Kim's "new" claim that she did not consent to the "gift through which Riverrock was funded," noting Kim did not argue that Mack wasted community assets or breached a fiduciary duty by making this "gift," "or that he lacked the power to make gifts without her consent."

Regarding Laurel, the trial court found Kim conceded that Mack had disclosed this asset, but allegedly not the $380,000 note Kurmac owed the company. The court noted that, even if the note was a community asset, the

19

court found it was offset in the same amount by a community debt, inasmuch as it was "undisputed" that Mack was responsible for, and paid, any such debt; and that she presented no evidence to support a finding that the "existence of the note or anything else related to Laurel" would have affected the total community assets "less debts available for distribution."

As relevant to this appeal, the trial court also rejected Kim's claim the Judgment should be set aside due to mistake. It found both parties were "fully aware" of what was being discussed at the mediation, including what the "material assets" were, their value, and how they would be divided.

As to the Kurmac note, the trial court found Kim knew the "material facts" about this asset, including the various positions the parties had taken over its value; they "reached a mutual understanding" of what she could expect to receive from this asset in the overall division of the estate; and she "specifically bargained" over this asset based on Brinig's valuation of Kurmac as of December 31, 2018. The court thus found a "valid meeting of the minds with respect to the [Kurmac] note: "$3,000,000 to [Kim to] be paid out at $15,000 each month, without interest."

d. Omitted Assets

The trial court found the Kurmac note was not omitted, as this asset was specifically bargained over by the parties at the mediation and included in the Judgment.

As to Riverock, the trial court found it also was not omitted because the company belonged to Bari and not the community. The court also found the community had no right to reimbursement for the "gift" of funds to Bari, which claim, in any event, Kim had "waived" in the MSA.

Regarding Laurel, the trial court found it too was not omitted, as this asset was "disclosed and addressed at the mediation," and that Kim also

20

failed to demonstrate that "any value attributed to Laurel was other than a bookkeeping artifact, or that the treatment in the Judgment of anything related to Laurel disadvantaged her."[18]

## II. DISCUSSION

A. *Mistake and the Kurmac Note*

As she did in the trial court, Kim contends on appeal that the court erred when it refused to set aside the Judgment based on mistake of law and/or fact because she believed she was receiving not only a guarantee from Mack to make monthly payments of $15,000 up to $3 million, but *also* the Kurmac note itself. At the time of the mediation, Kim valued the note at $2.7 million, whereas Mack valued it at $2.95 million.

As noted, Kurmac executed the promissory note on December 31, 2014, "pay[able] . . . to H. Mack Hembree" in the amount of $3,220,807.77 and bearing interest at six percent until paid, with the "[e]ntire note" "due and payable on 12/1/26."[19]

With regard to this asset, section 1(b) of the MSA (Section 1(b)) provided Kim would receive as her separate property: "The $3,000,000 note payable to Mack and Kim and payable by Kurmac, Inc. Mack and the corporation shall personally guarantee the note and shall guarantee personally that Kim shall receive the sum of $15,000 or more per month. No interest on the $3,000,000 note. Should any 2 payments be missed, the

---

[18] The trial court also found Kim had "abandoned" her claim that other assets were omitted from the Judgment, including several vehicles, precious metals, and tax refunds for the year 2019. Kim has not challenged this finding on appeal.

[19] The Kurmac note was signed by Mack as CEO of Kurmac and by Laura Cortez as company secretary. In a separate notation the note provided it was due on "12/31/26."

balance shall become due and payable. Should Mack's interest in Kurmac, Inc., be sold prior to the payoff of the $3,000,000 note, the balance then due on the note shall become due and payable. Mack shall further make arrangements in his Estate Planning (Will, Trust, etc.) to insure the guarantee of the above payments to Kim."

1. Guiding Principles

Section 2122 governs motions to set aside a judgment or part thereof in dissolution proceedings. To set aside a judgment based on mistake, the mistake may be "either mutual or unilateral, whether mistake of law or mistake of fact." (§ 2122, subd. (e).) " 'In addition to establishing mistake, the party seeking relief must also establish that "the facts alleged as the grounds for relief materially affected the original outcome and that the moving party would materially benefit from the granting of the relief." ' " (*In re Marriage of Binette* (2018) 24 Cal.App.5th 1119, 1125 (*Binette*); accord, *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 88–89 (*Kieturakis*) [a party moving under section 2122 bears the burden of proving entitlement to relief].)

We review a trial court's order denying a motion to set aside a judgment under section 2122 for abuse of discretion (*Binette, supra,* 24 Cal.App.5th at p. 1125) and its factual findings for substantial evidence, resolving all conflicts and drawing all reasonable inferences in favor of the decision (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144.) Under substantial evidence review, we examine the evidence in the light most favorable to the prevailing party and do not reweigh the evidence or reconsider credibility determinations. (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 34 (*Calcaterra & Badakhsh*).)

22

Here, Kim's alleged mistake as to the Kurmac note turns in part on her interpretation of Section 1(b), which requires us to apply principles of contract interpretation. (*In re Marriage of Rose & Richardson* (2002) 102 Cal.App.4th 941, 948–949) [" 'The meaning and effect of a judgment is determined according to the rules governing the interpretation of writings generally.' "].) " 'Where an ambiguity exists, the court may examine the entire record to determine the judgment's scope and effect. [Citations.] The court may also " 'refer to the circumstances surrounding the making of the order or judgment, [and] to the condition of the cause in which it was entered.' " ' " (*Ibid.*)

"The ultimate construction placed on [a] contract might call for different standards of review. When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. [Citations.] When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction [following a trial] will be upheld if it is supported by substantial evidence." (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8 (*Iqbal*); accord, *Estate of Williams* (2007) 155 Cal.App.4th 197, 205–206 (*Williams*) [" 'Where . . . extrinsic evidence is properly received, and such evidence is conflicting and conflicting inferences arise therefrom, the appellate court will accept or adhere to the interpretation adopted by the trial court provided that that interpretation is supported by substantial evidence.' "].)

2. Analysis

Kim argues that the trial court erred in refusing to set aside the Judgment based on her mistaken belief that it awarded her *both* the Kurmac note *and* a guarantee by Mack to pay her a minimum of $15,000 a month up

to the sum of $3 million, rather than just the latter. However, Kim's claim of mistaken belief was based primarily on her own testimony regarding her subjective understanding of the Judgment, which the trial court found not to be credible. We cannot second-guess the trial court's credibility finding on this issue. (*Estate of Berger* (2023) 91 Cal.App.5th 1293, 1309.)

Other evidence supports the trial court's ruling as to the absence of any mistake by Kim regarding the Kurmac note. Although the language of the Judgment is not a model of clarity, it stated that Kim would "receive the sum of $15,000 or more per month" with "[n]o interest on the $3,000,000 note." Because the Kurmac note itself required payment of six percent interest to Mack as the creditor, the provision stating that Kim would receive "no interest" is inconsistent with her theory that she was awarded the note itself. Moreover, the Judgment made no provision for the parties to amend or transfer the Kurmac note from Mack to Kim or take other appropriate action to substitute Kim for Mack as the creditor—nor is there any evidence that Kim ever made any such request after the Judgment was entered. Finally, Mack testified that his understanding of the Judgment was that Kim did not receive the Kurmac note itself, but only the *value* of that note to make the division of the parties' estate equal; that he guaranteed to pay Kim $15,000 a month, "no interest," up to $3,000,000; and that the monthly payment was principal only because he could not afford this payment if it included interest. Unlike Kim's testimony, the court found Mack's to be credible.

The record therefore shows a conflict in the evidence regarding Kim's allegedly mistaken interpretation of Section 1(b). (See *Iqbal, supra*, 10 Cal.App.5th at p. 8; *Williams, supra*, 155 Cal.App.4th at pp. 205–206.) The trial court resolved this conflict in part by finding Kim's testimony not credible and by examining the circumstances surrounding the MSA and

24

resulting Judgment, concluding that Mack's construction reflected the parties' intent when entering into the MSA. (See Civ. Code, § 1636 ["A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."].) Specifically, the trial court found Kim knew the "material facts with respect to the Kurmac note," including the various positions the parties had taken over its value, and that "the parties reached a mutual understanding" that Kim would receive "$3,000,000, to be paid out at $15,000 each month, without interest."! (AA 1441-1442)! The court thus found a "valid meeting of the minds with respect to the [Kurmac] note.

We conclude the trial court's findings are supported by substantial evidence. Indeed, the record shows before the mediation both parties identified the Kurmac note in their list of community assets and debts. At the mediation, Kim, with counsel and her *own* financial expert present, expressly negotiated over the note, at one point proposing she receive "half the note" and Mack receive the Kurmac business, which proposal he rejected. The evidence that Mack rejected Kim's proposal to receive "half the note" further supports an inference that the parties did not intend Kim to receive the entire note plus the guarantee. Accordingly, the record supports the trial court's findings that Kim was "fully aware" of the "material facts" regarding this asset and Kurmac in general, which Brinig had valued for purposes of the mediation as of December 31, 2018; that the parties reached a "mutual understanding" of what she would receive from the Kurmac note in the overall division of their estate; and that Kim did not have any mistaken belief as to terms of the Judgment regarding the Kurmac note.

What's more, because the parties voluntarily divided their property interests through mediation resulting in the MSA and Judgment, the trial court did not need to concern itself with whether that division was equal. (See e.g., § 2550 [equal division of community property is required "[e]xcept upon the written agreement of the parties, or on oral stipulation of the parties in open court"]; *Mejia v. Reed* (2003) 31 Cal.4th 657, 666 ["Whenever . . . the parties agree upon the property division, no law requires them to divide the property equally, and the court does not scrutinize the [marital settlement agreement] to ensure that it sets out an equal division."].) Nonetheless, the court in the instant case found the parties' division of the community estate was fair and equitable, inasmuch as Kim not only would be receiving monthly checks of $15,000 up to $3,000,000, but also received lump-sum payments of $2,000,000 and $250,000; $100,000 towards the mortgage on the Oceanside condominium she retained; and relief from $195,000 of community debt Mack paid to her mother. We thus conclude the trial court did not abuse its discretion when it refused to set aside the Judgment based on any purported "mistake" with respect to this asset. (See *Binette*, *supra*, 24 Cal.App.5th at p. 1125.)

We further conclude substantial evidence supports the trial court's finding that the public policy favoring the finality of judgments outweighed Kim's interest in having the Judgment set aside. (See § 2120, subd. (c) ["The public policy of assuring finality of judgments must be balanced against the public interest in ensuring proper division of marital property, in ensuring sufficient support awards, and in deterring misconduct."]; *In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 136–137 (*Varner*) [quoting subdivision (c) of section 2120].)

26

The parties have been vigorously litigating the division of their community estate since 2019, as evidenced by the size of the appellate record in this case. In addition, the Judgment incorporating the MSA was entered more than three years ago in March 2020, after Kim consented to its entry. And, as Kim herself recognized, if the Judgment was set aside, she did not have the ability to put the money she has already received "back in the pot." Based on the public policy afforded the finality of judgments, we conclude on this record that the trial court did not abuse its discretion when, for this separate reason, it denied Kim's Motion, and that substantial evidence supports its decision. (See § 2120; subd. (c); *Varner*, *supra*, 55 Cal.App.4th at pp. 136–137; see also *Calcaterra & Badakhsh*, *supra*, 132 Cal.App.4th at p. 34 [under substantial evidence review we examine the evidence in the light most favorable to the prevailing party].)

B. *Omitted Assets and the Kurmac Note*

Kim alternatively contends that, if the Judgment is not set aside under section 2122, subdivision (e) based on mistake, the trial court erred in failing to treat the Kurmac note as an omitted asset under section 2556.

1. Guiding Principles

Section 2556 provides: "In a proceeding for dissolution of marriage . . . the court has continuing jurisdiction to award community estate assets or community estate liabilities to the parties that have not been previously adjudicated by a judgment in the proceeding. A party may file a postjudgment motion or order to show cause in the proceeding in order to obtain adjudication of any community estate asset or liability omitted or not adjudicated by the judgment. In these cases, the court shall equally divide the omitted or unadjudicated community estate asset or liability, unless the

27

court finds upon good cause shown that the interests of justice require an unequal division of the asset or liability."

A party's delay in seeking postjudgment property adjudication does not bar relief under section 2556. (*In re Marriage of Huntley* (2017) 10 Cal.App.5th 1053, 1060.) In addition, section 2556 applies "even when former spouses were aware of the community property at the time the dissolution judgment was entered." (*Ibid.*) "The mere mention of an asset in the judgment is not controlling. [Citation.] '[T]he crucial question is whether the benefits were actually litigated and divided in the previous proceeding.' " (*In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, 501 (*Thorne & Raccina*).)

A party seeking relief under section 2556 bears the burden to show a community asset was omitted from the judgment. (See Evid. Code, §§ 500 ["Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he [or she] is asserting."] & 550, subd. (b) ["The burden of producing evidence as to a particular fact is initially on the party with the burden of proof as to that fact."].)

2. Analysis

As we have discussed, substantial evidence supports the trial court's finding the parties explicitly negotiated over the Kurmac note at the mediation and came to a "meeting of the minds" over what Kim could expect to receive from this asset, as set forth in Section 1(b) of the MSA. (See *Kieturakis, supra*, 138 Cal.App.4th at p. 85 [" 'Voluntary participation and self-determination are fundamental principles of mediation' " and divorce mediators " 'generally work to balance the negotiating power between the

28

parties,' " producing " 'agreements that are more fair and voluntary, rather than coerced.' "].)

Quite clearly, the Kurmac Note was not omitted from the Judgment, as Kim posits, but instead was "actually litigated and divided" by the parties in their overall division of the estate. (See *Thorne & Raccina*, *supra*, 203 Cal.App.4th at p. 501; accord, *Henn v. Henn* (1980) 26 Cal.3d 323, 330 [noting that a spouse's entitlement to a share of community property cannot be "altered except by judicial decree or *an agreement between the parties*" (italics added)].)

Kim in essence asked the trial court, and now is asking this court, to rewrite the MSA on terms more favorable to her. However, section 2556 neither authorizes modification of a judgment for property division nor a court to act on community assets (or debts) that were clearly contemplated by a parties' marital settlement agreement. (See *Kieturakis*, *supra*, 138 Cal.App.4th at p. 86 [noting that when parties opt to participate in mediation and understandably seek to "pursue their best interests and strive for an advantageous bargain," "if . . . any such favorable bargain could . . . be set aside at the option of the disappointed party, the effectiveness of mediation as a method of settling marital property disputes would be greatly impaired," thereby jeopardizing mediated settlements "because relatively few of them, upon close scrutiny, would likely be found to have been perfectly equal"]; accord, *In re Marriage of Simundza* (2004) 121 Cal.App.4th 1513, 1515 [affirming trial court order denying wife's motion to further divide former husband's pension benefit under section 2556 because the parties expressly agreed when entering into a stipulated marital dissolution judgment that wife would receive the "flat amount" of $200 per month for 12 years following husband's retirement, and thus the pension benefit was not a partially

omitted asset].)  We thus reject Kim's alternate argument that the trial court erred when it found the Kurmac note was not omitted from the Judgment.

C. *Riverock*

Kim next contends the trial court erred in finding Riverock was not omitted from the Judgment.  In support, Kim relies on sections 721, subdivision (b) and 1100.

Section 721, subdivision (b)[20] imposes a fiduciary duty upon transactions involving spouses, including a spouse's management and control of community assets as set forth in section 1100, subdivision (e).[21] Consistent with these sections, subdivision (b) of section 1100[22] prohibits a spouse from making a transfer or gift of community property without the written consent of the other spouse.  Courts have applied these laws to protect one spouse from unauthorized community property dispositions by the other spouse.  (See e.g., *Droeger v. Friedman, Sloan & Ross* (1991)

---

[20]    Subdivision (b) of section 721 provides in part: "[I]n transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other.  This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other."  (§ 721, subd. (b).)

[21]    Subdivision (e) of section 1100 provides in part:  "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721 . . . ."  (§ 1100, subd. (e).)

[22]    Subdivision (b) of section 1100 provides in part:  "A spouse may not make a gift of community personal property, or dispose of community personal property for less than fair and reasonable value, without the written consent of the other spouse."  (§ 1100, subd. (b).)

30

54 Cal.3d 26, 30 [nonconsenting husband was entitled to invalidate in its entirety an encumbrance on two parcels of community real property unilaterally made postseparation by wife].)

The trial court found Riverock was not a community asset, belonging to Mack's daughter "at all relevant times" after he had made a gift of money to her; that Kim, in any event, never raised consent, or lack thereof, as an issue or the related issue of whether Mack lacked the "power" to make this gift; and that it also would "be unable to make such . . . finding[s] based on the evidence presented at trial."

On appeal, Kim argues she timely objected to Mack's gifting of money to his daughter in her objections to the proposed statement of decision. Kim's argument, however, presupposes that Mack gifted away *community* funds. But Kim has failed to direct this court to any evidence in this voluminous record to support the finding that either Riverock, *or* the funds Mack transferred to his daughter to start the company, was a community asset subject to post-Judgment division under section 2556. (See *Belli v. Curtis Pub. Co.* (1972) 25 Cal.App.3d 384, 394, fn. 5 [a court of appeal is under no "duty" to "search the record for evidence which will serve to overturn the judgment [or order]".) Absent this showing, Kim cannot satisfy her burden to establish Riverock was an omitted asset. (See § 2556 [limiting the statute's application to community assets and liabilities]; Evid. Code, §§ 500, 550, subd. (b).])

Moreover, even assuming Mack used community assets to fund Riverock, we disagree she raised her alleged lack of consent to the transfer as an issue in the trial court. In her objections to the proposed SOD, Kim merely argued there "was no evidence proffered at trial that the funds [for Riverock] were a gift." But as summarized *ante*, that is not a correct

31

statement of the record. At trial, Mack testified he gifted his daughter Bari $200,000 to invest in real estate; that the money was for Bari to use as she saw fit; and that he had no interest in the company. Mack also made similar statements to Brinig *before* the mediation, who therefore considered Riverock "off the table."

Despite this evidence, Kim did not argue below that Mack lacked authority under section 1100, subdivision (b) to make the gift to his daughter, or that Kim ever objected to this gift, both of which are inherently factual questions that should have been decided by the trier of fact. For this separate reason, we conclude the trial court did not err in finding Riverock was not subject to section 2556. (See *Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488 ["appellate court can deem an argument raised in an appeal . . . waived if it was not raised below and requires consideration of new factual questions"]; *City of Merced v. American Motorists Inc. Co.* (2005) 126 Cal.App.4th 1316, 1327 ["[s]ince this new theory involves an issue of fact . . . and the facts to support the theory were not developed below, we find the argument was waived for failure to raise it in the trial court"].)

D. *Laurel*

Kim also contends the $380,000 Kurmac promissory note held by Laurel was omitted from the Judgment.

Not unlike the situation involving Mack's gift of money to Bari, Kim in her opening brief does not explain why Laurel should be treated as a community asset. Although Kim asserts Mack "put money into Laurel," she provides no evidence when he did so, despite Laurel being in existence for more than 20 years, or whether that money was separate or community property (or a combination thereof). As such, we conclude Kim has failed to

32

meet her burden of proof demonstrating that Laurel was part of the community estate. (See § 2556; Evid. Code, §§ 500, 550.) We are not required to comb the record for confirmation of a critical fact Kim is asking us to assume without pointing to any supporting evidence.

In addition, even *if* Laurel were deemed a community asset, we would still conclude the trial court did not err in refusing to divide it under section 2556. Substantial evidence supports the court's finding that the $380,000 note—"or anything else related to Laurel"—did not affect the total amount of "community assets *less debts* available for distribution." (Italics added.) It is undisputed that Laurel's only asset was the $380,000 debt owed to it by Kurmac. Because Kurmac was itself a community asset, Laurel's $380,000 asset—if treated as community property—would have been offset by Kurmac's $380,000 debt. Mack received Kurmac as his separate property under the Judgment, which included Kurmac's $380,000 liability for its debt to Laurel—later paid off by Kurmac. Thus, the value of Mack's agreed share of the community property was reduced by the amount of the $380,000 note to Laurel. Kim cites nothing in the record to establish that these offsetting figures were not taken into account by the parties in valuing and splitting up the community property and awarding Kim payments of $15,000 per month totaling $3 million. For the same reason, even assuming any error, Kim has failed to demonstrate it is reasonably probable that a result more favorable to her would have been reached had this asset been subject to division under section 2556. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818, 836, applies to civil cases].)

## III. DISPOSITION

The trial court's August 22, 2022 order denying Kim's Motion to set aside the Judgment, or alternatively, to enforce the Judgment and divide assets, is affirmed. In the interests of justice, the parties are to bear their own costs on appeal. (See Cal. Rules of Court, rule 8.278(a)(5).)

BUCHANAN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

34